George E. EIBEL, Petitioner,

v.

DEPARTMENT OF the NAVY, Respondent.

Appeal No. 87–3559.

United States Court of Appeals, Federal Circuit.

Sept. 26, 1988.

John C. Smuck, Cross, Murphy, Smuck & Houston, Washington, D.C., argued for petitioner.

Joseph A. Kijewski, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for respondent. With him on the brief were John R. Bolton, Asst. Atty. Gen., David M. Cohen, Director and Robert A. Reutershan, Asst. Director.

Before SMITH, NIES and NEWMAN, Circuit Judges.

NIES, Circuit Judge.

George E. Eibel seeks review of the final decision of the Merit Systems Protection Board, Docket Nos. DC04328710064 and DC531D8710066, sustaining his removal from the Department of the Navy and his denial of a within-grade increase in salary for unacceptable performance under 5 U.S. C. § 4303 (1982).[1] Mr. Eibel challenges that decision on the ground that the performance standards established for the position from which he was removed are invalid as a matter of law. We agree and, accordingly, reverse.

### Background

George Eibel, a civil servant with twelve and one-half years of service, held the position of General Engineer, GS–801–11, in the Facilities Department, Public Works Division, Marine Corps Development and Education Command, Quantico, Virginia. On January 1, 1986, he was given a set of revised performance standards by his new supervisor, Ensign (later Lieutenant, Junior Grade) Timothy W. Burns. In place of two general critical elements for Mr. Eibel's position, Ens. Burns established six critical elements and set out standards for Highly Satisfactory and Marginal levels of performance.

Critical elements five and six, upon which the board eventually affirmed the agency's actions, read as follows:

5. CRITICAL ELEMENT: ENERGY AWARENESS

*Highly Satisfactory Standard:* Coordinate and develop agenda for annual Energy Awareness Week. Initiate and write twelve or more energy conservation articles for the Marine Corps Development and Education Command base newspaper, without assistance, to be approved by the supervisor.

*Marginal Standard:* No agenda for annual Energy Awareness Week is developed. No more than six energy conservation articles for the Marine Corps Development and Education Command base newspaper. Major assistance is required at least 50% of the time to complete articles.

6. CRITICAL ELEMENT: COMMUNICATE WRITTEN AND ORALLY.

*Highly Satisfactory Standard:* Ability to communicate both orally and in written correspondence with military personnel, engineers, planners, technicians, and public officials without any difficulty.

*Marginal Standard:* Requires assistance at least 50% of the time when communicating in written and oral correspondence with military personnel, engineers, planners, technicians, and public officials.

Lt. Burns testified that, with respect to element five, Mr. Eibel had prepared and submitted four energy conservation articles between January 1, 1986 (new critical

---

**1.** The board consolidated Mr. Eibel's appeals from the performance based actions taken by the Navy against him.

elements established) and July 31, 1986 (final performance appraisal), each of which required revision. Lt. Burns cleared only one for submission to Burns' supervisor. None was published.

As to Element six, the board found that the agency offered no evidence that Mr. Eibel had failed to achieve a satisfactory level in oral communication. However, with respect to written correspondence, Lt. Burns testified that Mr. Eibel required assistance more than ninety percent of the time for most of the rating period and required only slightly less assistance prior to his removal.

From the January promulgation of the new standards through July 1986, Lt. Burns authored a series of "Letter[s] of Caution" criticizing Mr. Eibel's performance under critical elements five and six and other elements and rating his performance "unsatisfactory". Those events culminated in Mr. Eibel's removal under Chapter 43 on October 24, 1986, for "unacceptable performance". On appeal to the MSPB, the action was sustained only with respect to critical elements five and six.

Petitioner maintains that the above standards set *no* minimum level for achievement of acceptable performance and that he was rated unsatisfactory on the basis of Lt. Burns' subjective determination of what the standards mean. The Administrative Judge (AJ) opined that the marginal standard for the fifth critical element was "not as clear as could be wished" but that, because Lt. Burns "explained" the standard to Mr. Eibel, the AJ rejected Mr. Eibel's attack on the standard itself. Apparently the same rationale justified her upholding the "marginal" standard for the sixth critical element. The board denied Mr. Eibel's petition for review.

## Issue

Whether the marginal performance standards, pertaining to critical elements five and six for the position from which Mr. Eibel was removed, are valid?

## Opinion

Mr. Eibel was removed from his position under Chapter 43 of the Civil Service Reform Act, 5 U.S.C. §§ 4301–15 (1982). Section 4303(c)(2) provides in pertinent part: "The decision to ... remove an employee ... may be based only on ... unacceptable performance." As explained in *Wilson v. Department of Health and Human Services*, 770 F.2d 1048, 1050 (Fed.Cir.1985), the term " '[u]nacceptable performance' in this context is a term of art; it is 'performance ... which fails to meet established performance standards in one or more critical elements of such employee's position.' 5 U.S.C. § 4301(3).... [I]f an employee fails to meet the level of work set forth in a performance standard that specifies in objective terms what constitutes satisfactory performance in a critical element of a position, then the employee is subject to demotion or removal."

It is readily apparent that the central focus of the Chapter 43 performance appraisal system is on the performance standards for a particular position, which must set forth in objective terms the minimum level of performance which an employee must achieve to avoid, *inter alia*, removal for "unacceptable performance". In this connection, 5 U.S.C. § 4302(b)(1) provides that performance standards must, "to the maximum extent feasible, permit the accurate evaluation of job performance on the basis of objective criteria." We conclude that the performance standards for Mr. Eibel's position fall woefully short of meeting these statutory requirements.

The government concedes that the standards for marginal performance of critical elements five and six cannot be read literally. With respect to "Energy Awareness", for example, read literally, marginal performance is achieved if no agenda is developed for Energy Awareness Week and "no more than" six articles on energy conservation are written. Because Mr. Eibel did not write six articles, he literally met the specified standard for marginal performance.

While admitting that the standards are "backwards" standards, reading more like unacceptable than acceptable performance

standards, the government asserts that the standard should be upheld in view of Lt. Burns' explanation to Mr. Eibel with respect to what was required for a satisfactory rating.

Testifying before the board, Lt. Burns explained his understanding of the ratings as follows (in pertinent part):

A. I consider marginal the border between UNSAT and satisfactory. So if Mr. Eibel met everything that's stated on the marginal SAT standard, I would mark him as a satisfactory.

Q. I think that on direct you mentioned that you equate marginal and satisfactory as the same.

A. No, I don't.

Q. No? I thought that was what you said.

A. Marginal, it's my opinion that it's not quite UNSAT, but he still hasn't attained what I feel is satisfactory. But if he attained, where I said no more than six, if he did six, fine; he met marginal. He met that standard as my minimum or as that border between UNSAT and satisfactory, and I would consider that he did satisfactory.

The confusion in Lt. Burns' understanding of the meanings of "marginal" and "satisfactory", evidenced above, pervaded his testimony. With respect to whether an agenda had to be prepared to achieve a satisfactory rating under critical element five, the following exchange occurred:

JUDGE GIBSON: Well, I think it's pretty clear by the language there that it means that even [if] he didn't do an agenda for Energy Awareness Week, he would still meet the marginal standard. Is that correct, Lieutenant?

LT. BURNS: If he didn't?

JUDGE GIBSON: If he didn't. What you say is, "No agenda for annual Energy Awareness Week is developed." That is the marginal standard; therefore, even if [he] didn't develop any agenda, he would still meet the marginal standard?

LT. BURNS: No.

JUDGE GIBSON: Well, that's what it says.

LT. BURNS: That's not the intent. That meant if he didn't do it then he didn't meet that criteria.

With respect to the Lieutenant's explanations to Mr. Eibel of the standards, the record states:

Q. It is your testimony that you said, "I'm going to explain the marginal standard to you, Mr. Eibel," or "George"?

A. No, I didn't do that. He didn't ask.

Q. You were telling him what was satisfactory, not what was marginal. Isn't that true?

A. Yes.

Further, Lt. Burns had never noted before the hearing that the standards he wrote were "backwards", as the following testimony evidences:

Q. Well, my only question is whether he satisfied the language of this marginal standard, and I take it you agree with me that he satisfied the literal language of the marginal standard in his performance?

. . . .

LT. BURNS: Literally, yes. That wasn't the intent of that. I see now that it looks like I made a mistake on these.

MR. SMUCK: OK.

LT. BURNS: That was never pointed out to me before that.

. . . .

JUDGE GIBSON: In other words, you've phrased the whole of this standard in a backward fashion?

LT. BURNS: Now that I see that, I can see how someone can interpret it that way, yes, ma'am.

We do not see any point in belaboring this matter. The performance standards required by Chapter 43 must set forth objective criteria for the critical elements of a position, which will inform the employee what is necessary to earn a rating of "acceptable performance". The standards for Mr. Eibel's position do not.

As an initial matter, we note that the standards here are not written in the terminology of Chapter 43 or the implementing

regulations, 5 C.F.R. § 432 (1986), which speak of "acceptable" and "unacceptable" performance. Nowhere in the subject standards do these terms appear. Therefore, the terms that were used must be converted into Chapter 43 terms, which presents the probability of varying interpretations. Here, the standards used the terms Marginal and Highly Satisfactory. Whether "acceptable" performance is achieved at the marginal level or somewhere in between is debatable. This is illustrated by Lt. Burns' testimony at one point that he would not equate "marginal" with "satisfactory", which is the term he used generally to mean "acceptable".

In any event the standards here, even if "marginal" is equated with "acceptable", are directly comparable to the standard held invalid in *Wilson*, 770 F.2d at 1053. The performance standard at issue in *Wilson* defined minimally acceptable performance for a critical element of Wilson's position as, "Assignments and instructions to staff are hastily made and sometimes misunderstood. Direction of work activities is occasionally effective in achieving objectives." *Id.* This court characterized such provisions as "a parody of a proper standard" and "subjective." *Id.* Here, as well, the standards are not merely backwards, but also subject to various interpretations and subjective evaluation. As an example, per Lt. Burns, Mr. Eibel prepared a sufficient number of conservation articles during the period of his evaluation. However, Lt. Burns read into the standard a requirement that the articles had to receive Lt. Burns' approval for *publication* without editing. Neither Mr. Eibel nor Lt. Burns are professional journalists. Nor was the base newspaper subject to Lt. Burns' directive. Thus, Lt. Burns' opinion that the articles were not ready for publication is a meaningless, subjective evaluation. The newspaper staff might have found suitable material in the Eibel articles for a story if rewritten by journalists, but Lt. Burns did not allow their submission to the newspaper.

Similarly, even if the standard under critical element six were to be rewritten to state that the employee "does not require assistance more than 50% of the time in written *and* oral correspondence," the standard would be at best ambiguous. It would literally require failure in *both* written and oral communications. Yet here, Mr. Eibel was rated unsatisfactory even though his oral communication skills were found acceptable.

Contrary to the government's argument, the performance standards in this case do not fall within the rulings of this court that some standards, which inherently require a degree of subjective judgment by the supervisor, may be "fleshed out" and "clarified" during counseling.[2] The standards here, in contrast, would have to be totally rewritten, not supplemented, to inform an employee of what is necessary to achieve an acceptable rating. Further, we cannot agree with the government that Lt. Burns could have "clarified" the standards before the rating period. Lt. Burns did not even recognize that the standards were "backwards", and his testimony on what the standards mean, assessed overall, is at best confusing.[3]

CSRA has now been in the statute books since 1978. This court was aware of the monumental task each agency or depart-

---

**2.** *See DePauw v. United States Int'l Trade Comm'n,* 782 F.2d 1564, 1566 (Fed.Cir.), *cert. denied* 479 U.S. 815, 107 S.Ct. 69, 93 L.Ed.2d 27 (1986); *Adkins v. Department of Hous. & Urban Dev.,* 781 F.2d 891, 896 (Fed.Cir.1986); *see also Jackson v. Envtl. Protection Agency,* 770 F.2d at 1056 (consolidated with *Wilson v. Department of Health & Human Servs.*)

**3.** It has been said that the public in dealing with the government is required to dot "i's" and cross "t's." *Sence v. United States,* 394 F.2d 842, 851, 184 Ct.Cl. 67 (1968). That obligation is equally imposed on the government, *Baltimore Baseball Club, Inc. v. United States,* 481 F.2d 1283, 1293, 202 Ct.Cl. 481 (1973), and nowhere more critically than in the business of supervising its employees. A twelve-year veteran of the civil service, supervised by a very junior officer, is entitled to know by what standards he will be judged in serving that officer and his agency. The lieutenant expects to receive clear orders from his seniors; he has an equal obligation to develop the ability to give, as well as receive, such orders.

ment faced in drafting meaningful performance standards for thousands of positions, coupled with the inexperience of those charged with implementing the new system. Our approval of initial standards should not be taken to mean that those standards would not later be disapproved. As experience is gained in writing standards which are understandable and appropriate to various types of positions, the court expects the agencies to revise and update original performance standards. *See Lovshin v. Department of the Navy,* 767 F.2d 826, 842 (Fed.Cir.1985) (in banc), *cert. denied,* 475 U.S. 1111, 106 S.Ct. 1523, 89 L.Ed.2d 921 (1986). When the court has disapproved the language of certain standards, as it did in *Wilson,* it is the responsibility of every agency to review its own performance standards for comparable defects and to change them appropriately. The defective standards in this case were established on January 1, 1986, months after the *Wilson* decision, which had given clear direction that "backwards" standards are subject to invalidation.

Removal or demotion by an agency under Chapter 43 is subject to a more limited review by the board than actions under Chapter 75 of Title 5. *Lovshin,* 767 F.2d at 834; *compare* 5 U.S.C. § 7701(c)(1)(A) (agency decision sustained if supported by substantial evidence) *with* 5 U.S.C. § 7701(c)(1)(B) (agency decision sustained if supported by a preponderance of the evidence). Under Chapter 43, employees will be protected from arbitrary treatment only if agencies establish objective performance standards that are "reasonable, sufficient in the circumstances to permit accurate measurements of the employee's performance, and adequate to inform the employees of what is necessary to achieve a satisfactory or acceptable rating." *Wilson,* 770 F.2d at 1052. Such standards are the foundation for any performance-based action under Chapter 43.

Under our standard of review, we hold that the performance standards upon which Mr. Eibel's removal and denial of his within grade increase were based are not in accordance with the law. 5 U.S.C. § 7703(c) (1982). The standards before us neither provide an accurate objective measurement of Mr. Eibel's level of achievement nor reasonably inform the employee of what is acceptable performance. Accordingly, the decision of the Merit Systems Protection Board sustaining Mr. Eibel's removal under Chapter 43 is reversed.

REVERSED.