**Michael E. THOMPSON, Petitioner,**

v.

**DEPARTMENT OF THE
NAVY, Respondent.**

No. 03–3072.

United States Court of Appeals,
Federal Circuit.

DECIDED: Dec. 5, 2003.

Before CLEVENGER, BRYSON, and
GAJARSA, Circuit Judges.

DECISION

PER CURIAM.

Michael E. Thompson appeals from a
decision of the Merit Systems Protection
Board, Docket Nos. SE–0432–99–0185–B–1
and SE–0531D–99–0186–B–1, affirming the
decision of the Department of the Navy to
remove him from his position. We *affirm.*

## BACKGROUND

Mr. Thompson was employed as an Environmental Engineer in the Environmental Office of the U.S. Pacific Fleet in Pearl Harbor, Hawaii, from December 1994 until his removal in March 1999. Before 1998, Mr. Thompson's performance had never been rated as less than satisfactory. At the start of the 1998 performance cycle, however, the Pacific Fleet implemented a new pass/fail performance system, and during that cycle Mr. Thompson's performance declined. The new performance system contained two critical elements for Mr. Thompson's position: "Organizational Support and Communication" and "Execution of Duties," each of which included a description of the acceptable level of performance for the position.

In August 1998, Mr. Thompson's supervisor issued him a letter of caution for unacceptable performance with respect to both critical elements. Mr. Thompson was advised that he would be given an opportunity to improve his performance to an acceptable level during a 92–day performance improvement period ("PIP"). At the conclusion of the PIP, the Navy concluded that Mr. Thompson's level of performance had not improved. As a result, he was removed from his position.

Mr. Thompson appealed his removal to the Merit Systems Protection Board on two grounds: that the system used to evaluate him was arbitrary and capricious, and that he suffered from a mental condition known as Adjustment Disorder with Depressed Mood, which prevented him from performing his duties effectively. Following a hearing, an administrative judge reversed the removal decision based on her conclusion that the agency's requirement that Mr. Thompson make no more than three errors during the PIP was too strict. The administrative judge, however, rejected Mr. Thompson's affirmative defense of discrimination based on disability, holding (1) that Mr. Thompson had not shown that his mental condition constituted a disability, (2) that his mental condition did not affect his performance, and (3) that the Navy had no duty to accommodate his condition.

The Navy appealed the administrative judge's initial decision to the full Board, which reversed the initial decision, holding that the requirement that Mr. Thompson make no more than three serious errors during the course of the 92–day PIP was reasonable. On remand, the administrative judge sustained the removal action, and Mr. Thompson took this appeal.

## DISCUSSION

Mr. Thompson raises two challenges to the Board's decision. First, he argues that he suffered from a mental illness that rendered him medically incapable of performing at an acceptable level immediately prior to and during the PIP. Accordingly, he contends that he was not provided with a reasonable opportunity to improve his performance during the PIP. Second, he argues that the performance standards for his position were vague, subjective, and unreasonable, and that they did not permit accurate evaluation of his performance based on objective criteria. In addition, he contends that the agency in effect created new performance standards during the PIP, which denied him the right to demonstrate acceptable performance.

### A

Mr. Thompson argues that he was denied an opportunity to improve his performance during the PIP because he was suffering from a psychological disorder during that time. He contends that the psychological disorder, Adjustment Disorder with Depressed Mood, was responsible

for the decline in his performance and made it impossible for him to satisfy the requirements of the PIP. Because the decline in his performance was related to a mental condition of which he was not aware at the time, he urges that the Board should have held that he was denied an adequate opportunity to improve his performance.

The administrative judge found that the evidence did not suggest that Mr. Thompson's condition rose to the level of a recognized disability under the Rehabilitation Act, 29 U.S.C. § 794. According to the administrative judge, Mr. Thompson "failed to establish that he was an individual with a disability because his impairment did not constitute a significant barrier to employment or substantially limit his ability to continue working as an engineer." Mr. Thompson has not shown that the administrative judge's finding was unsupported by substantial evidence. Indeed, Mr. Thompson in his brief acknowledges that his mental condition did not constitute a legally recognizable disability.

██ Absent a disability, there is no legal basis for Mr. Thompson's assertion that his mental condition is a defense to termination. The Navy has the authority to terminate based on poor performance if the poor performance is not caused by a legally recognizable disability. 5 U.S.C. § 4302(b). That is true even if, as Mr. Thompson contends was true in his case, the employee is not aware of the condition and therefore does not seek treatment for the condition before or during the performance improvement period. In any event, the administrative judge found that Mr. Thompson had "failed to provide sufficient evidence to show by a preponderance of the evidence that [his] medical condition caused his unacceptable performance during the relevant time period." Mr. Thompson has not shown that

the administrative judge's finding that Mr. Thompson's mental condition was not responsible for his performance was unsupported by substantial evidence. Accordingly, we uphold the Board's rejection of Mr. Thompson's argument that he was denied an adequate opportunity to improve his performance because of his medical condition.

B

Mr. Thompson next argues that the standards the Navy used to evaluate his performance were invalid because they were vague, subjective, and unreasonable. Under 5 U.S.C. § 4302(b)(1), a performance evaluation system must establish "performance standards which will, to the maximum extent feasible, permit the accurate evaluation of job performance on the basis of objective criteria." The performance standards should "inform the employee of what is necessary to achieve a satisfactory or acceptable rating." *Wilson v. Dep't of Health & Human Servs.*, 770 F.2d 1048, 1052 (Fed.Cir.1985).

The performance standard used to evaluate Mr. Thompson's performance contained two critical elements: "Organizational Support and Communication" and "Execution of Duties." The requirements of the first critical element were set forth as follows: "Understands the organization's goals and priorities. Fully complies with the organization's policies, regulations, and procedures. Communicates orally and/or in writing to perform work." The standard for "acceptable" performance of that critical element was set forth as follows: "Promotes and properly uses administrative channels. Follows the policies, regulations and procedures and is aware of the organization's goals and priorities to produce efficient performance of job operations. Communicates well and maintains good rapport with supervisor

and co-workers. Keeps supervisor, co-workers and customers informed."

The requirements of the second critical element were set forth as follows: "Performs assigned work by applying technical knowledge and skills. The services provided and/or work produced is of acceptable quality." The standard for "acceptable" performance of that critical element was set forth as follows: "Readily accepts work assignments and follows instructions. Independently and efficiently uses technical knowledge and skills. Services provided and/or work produced is of good quality, timely and responsive to the supervisor, customer, and the organization priorities and requirements."

■ Although the performance standards for Mr. Thompson's position were somewhat general in nature, we agree with the Board that they were sufficient to explain to an employee what constituted acceptable performance in the position and thus satisfied the statutory requirement. In fact, the standards applicable to Mr. Thompson were quite similar to the standards that this court upheld in the *Wilson* case, on which Mr. Thompson relies. *See Wilson*, 770 F.2d at 1055. As the court explained in *Wilson*, the performance requirements for a professional position cannot be expected to be set forth in a "purely mechanical way." *Id.* at 1052. Thus, "some tasks may be rated only with a certain modicum of subjective judgment," and in such cases specific numerical values are not suitable. *Id.* at 1055.

The standards adopted in this case are very different from those held invalid in *Eibel v. Dep't of the Navy*, 857 F.2d 1439 (Fed.Cir.1988), on which Mr. Thompson relies. In that case the court concluded that the performance standards at issue were vague, subjective, and (as the government conceded) could not be read literally. The court concluded that the stan-

dards did not describe what was necessary for acceptable performance, as the statute requires, but in fact were written "backwards" in describing what constituted marginal performance, i.e., the standards described "marginal performance" in terms of the failure to achieve particular objectives rather than as requiring the attainment of a particular level of achievement. In this case, the standards described what was necessary for acceptable performance and did so in a reasonably objective manner.

In addition, as in *Wilson*, the standards in this case were fleshed out and implemented in more detail in the letter given to Mr. Thompson at the outset of the PIP. Thus, he was advised that in the course of the PIP he would be expected to satisfy the following requirements under the first critical element and make no more than three errors in so doing:

a. To follow administrative channels, regulations, policies or procedures; or

b. To comply with directives and instructions while demonstrating knowledge of the organization's goals and priorities; or

c. To communicate effectively, both orally and in writing, with your Section Leader, other staff members, and [supervisor]; or

d. To properly coordinate work requirements; or

e. To keep your Section Leader, customers, and [supervisor] informed of work-related issues, their development and status.

With respect to the second critical element, he was advised that he must "complete assigned actions so that there are no more than three valid findings where you fail to produce a product or provide a service because the quality, timeliness, or

responsiveness is unacceptable, as determined by the supervisor."

As in the *Wilson* case, the governing standards were thus fleshed out and implemented in some detail at the outset of the PIP. The performance standards, particularly as supplemented prior to the PIP, adequately informed Mr. Thompson of "the specific areas in which he needed improvement and of the specific tasks by which he could satisfy [his agency's] concerns." *Wilson*, 770 F.2d at 1056. The guidance that Mr. Thompson was given at the outset of the PIP constituted an effort to provide additional specificity with regard to the performance standards already applicable to his position; contrary to Mr. Thompson's contention, they did not constitute new performance standards. Moreover, although Mr. Thompson objects to the selection of three errors with respect to each of the critical elements as the standard applicable to his PIP, the Board held that the "three error" standard was reasonable in light of evidence that a typical employee working under the standards that applied to Mr. Thompson made "probably three to four errors in a given year." Accordingly, we reject Mr. Thompson's argument that the standards that were applied to him during his PIP were insufficiently detailed as to be arbitrary and capricious, or that they impermissibly departed from the standards applicable to his position generally.

The administrative judge found that during the PIP Mr. Thompson made at least 10 major errors with respect to each of the critical elements. Those errors were not minor ones, such as the isolated spelling mistakes that Mr. Thompson focuses on, but constituted serious problems, such as repeatedly missing important deadlines, going outside the chain of command, and making rude and insubordinate remarks to his supervisor. Although Mr. Thompson asserts that his supervisor acted arbitrarily in identifying the errors Mr. Thompson committed during the PIP, the evidence does not support his contention that the errors on which his removal was based were minor or should not have been held against him. To the contrary, there is ample evidence to support the Board's conclusion that Mr. Thompson committed more than the permissible number of serious errors during the PIP and that the agency therefore acted lawfully in removing him because of the inadequacies in his performance.