**Tomaz L. ROMERO, Petitioner,**

v.

**DEPARTMENT OF THE ARMY,
Respondent.**

No. 82–1279.

United States Court of Appeals,
Tenth Circuit.

June 7, 1983.

Sylvian R. Roybal, Remigio Pete Reyes, Denver, Colo., for petitioner.

Robert N. Miller, U.S. Atty., Janis E. Chapman, Asst. U.S. Atty., Denver, Colo., John S. Albanese, Civilian Personnel Litigation, JAG, Dept. of the Army, Washington, D.C., for respondent.

Before PICKETT, McWILLIAMS and DOYLE, Circuit Judges.

PICKETT, Circuit Judge.

After examining the briefs and the appellate record, this three-judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. See Fed.R. App.P. 34(a): Tenth Circuit R. 10(e). The cause is therefore ordered submitted without oral argument.

Tomaz L. Romero, while employed by the U.S. Department of Army as a civilian guard at the Rocky Mountain Arsenal near Commerce City, Colorado, was permanently removed from service upon allegations of insubordination and threatening a superior officer with a deadly weapon. In challenging the validity of the discharge, Romero exhausted his statutory and administrative remedies including an appeal to the Merit Systems Protection Board (MSPB) which affirmed the discharge. He now petitions

this court for a review of the Board's action as authorized by 5 U.S.C. § 7703. The material provisions of § 7703, as they relate to appeals of this nature are:

(c) In any case filed in the United States Court of Claims or a United States court of appeals, the court shall review the record and hold unlawful and set aside any agency action, findings, or conclusions found to be—

(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(2) obtained without procedures required by law, rule, or regulation having been followed; or

(3) unsupported by substantial evidence;

In addition, 5 U.S.C. § 7513(a) provides:

(a) Under regulations prescribed by the Office of Personnel Management, an agency may take an action covered by this subchapter against an employee only for such cause as will promote the efficiency of the service.

Romero does not contend that the action of the agency was arbitrary, capricious or that there was any defect in the removal proceedings. Although other errors are suggested, the primary question is whether the decision is supported by substantial evidence and that the discharge will promote the efficiency of the service.

In due course, the MSPB designated a presiding officer to conduct an evidentiary hearing and to make findings as to the validity of the discharge. Romero requested that he be represented by Kenneth Bull, a non-lawyer national union representative from Washington, D.C. In the appeal proceedings, Romero was represented by attorneys of his choice.

At the hearing, the agency, in support of its action, relied primarily upon the testimony of Lt. Alexander Petrochoko which was to some extent, corroborated by guard John Cherry, and John L. Westbrook, Security Captain of C-Shift at the arsenal. Petrochoko testified that on the evening of May 25, 1979, he was performing his duties as Acting Shift Commander of the guard on that day. At the same time, Romero was on guard duty at the arsenal under his supervision. At about 9 o'clock on that evening, Petrochoko was leaving one of the arsenal buildings to check the personnel posts and patrols in the area. On his way to his vehicle, he met Romero and a guard, John Cherry. Romero requested that he be permitted to see some records which related to some union members employed at the arsenal. Apparently Petrochoko replied in a rather curt manner, stating that he had other things to do rather than showing records. Romero was advised to see another lieutenant in regard to his request.

Petrochoko testified that upon his refusal to immediately grant the request, Romero "just blew up" and proceeded to abuse him with loud, vulgar, and obscene profanity. At the time, Romero was carrying a loaded M-16 rifle over his shoulder by use of the sling on the weapon. Following a word by word description of Romero's profanity, which was vile, vulgar, obscene and degrading by any standard, Petrochoko stated:

"I was caught off guard, I was not expecting this, and then he came toward me and when he did, he threw the rifle off his shoulder and it landed in both of his hands in front of him. The left hand was in front of the rifle and the right hand was in the vicinity of the trigger guard, and he came at me. You have got it written there in the statement, using this profanity at me, and he came right up to me and when he came up to me, he put his face close to mine * * * * ".

Petrochoko further testified that from Romero's actions and appearance, he was frightened and believed that he intended the use of the rifle to do him bodily harm.

The record discloses that guard John Cherry was with Romero when they met Lt. Petrochoko but did not stop. Later, he heard loud profanity directed at Petrochoko by Romero. He characterized this language as "abusive and insubordinate".

During a meeting with Capt. John L. Westbrook a few days after the incident, with reference to the threats with his M-16

rifle, Romero stated, "I did not draw the weapon. I took it off my shoulder."

Romero's defense to the charges, while admitting a minor confrontation with Petrochoko on the evening in question, was a categorical denial that he cursed Petrochoko or threatened him in any way. He testified that during this incident, his M–16 rifle was over his shoulder in a sling position and remained there.

In disposing of the case, the presiding officer stated:

"Regarding the indefinite suspension, the agency had determined that his retention, as a guard in a critical and sensitive area, was detrimental to the interests of the Government and could have constituted a threat to his supervisors, employees, or the general public. In view of the evidence of record, I conclude that the preponderance of the evidence supports the agency's action of indefinitely suspending the appellant during the time in question and that such action promoted the efficiency of the service.

Regarding the removal action, I conclude that the preponderance of the evidence supports the agency's action in removing the appellant and that such action promoted the efficiency of the service."

On appeal the MSPB, after reviewing the record and analyzing the evidence, concluded that the presiding officer's decision was supported by credible evidence and affirmed.

The Civil Service Reform Act of 1978 undertook to rewrite, revise and simplify the conglomeration of statutes under which the vast and unwieldly civil service system of the United States was managed. In the Senate Report to Congress, these statutes were described as:

... "an outdated patchwork of statutes and rules built up over almost a century. Federal management practices are antiquated in comparison with the current state of the managerial art. Research and experimentation concerning the man-

agement practices is virtually nonexistent." (1978 U.S.Code Cong. & Ad. News pp. 2723, 2725)

The report also stated that the complex rules and procedures often afforded a refuge for incompetent and inefficient employees and made it "almost impossible to remove those who were not performing." (p. 2725). The 1978 Act sought to remedy this condition by providing procedures whereby the agencies could more efficiently manage their operations including the discipline or removal of employees who were found to be inefficient, incompetent, or otherwise unfit for continuing service in the agency. To protect employees from an abuse of agency action, the MSPB, a neutral body, was created. Pursuant to established rules and regulations, the MSPB was authorized to conduct hearings to determine the validity of an agency's action affecting the tenure of a civil servant's employment. 5 U.S.C. § 7701(a)(2) provides that at such hearings, the employee shall have the right "to be represented by an attorney or other representative."

 The prevailing rule is that the judicial review of MSPB decisions is very narrow. It is limited to a determination of whether the decision has a rational basis and is supported by substantial evidence. This court applied the rule in *Henkle v. Campbell*, 626 F.2d 811 (10th Cir.1980). *See also Jones v. Farm Credit Administration*, 702 F.2d 160 (8th Cir.1983); *Weiss v. United States Postal Service*, 700 F.2d 754 (1st Cir.1983);[1] *Risner v. United States Department of Transportation*, 677 F.2d 36 (8th Cir.1982); *Calhoun v. Bailar*, 626 F.2d 145 (9th Cir.1980). From an examination of the record, we have no difficulty in concluding that the Board's decision has a rational basis and is supported by substantial evidence.

 Finally, Romero belatedly urges that the decision of the MSPB should be reversed because (1) he was not represented

---

**1.** In the *Weiss* case, Chief Judge Coffin of the 1st Circuit reviewed the legislative history relating to the purpose of the 1978 Reform Act and the weight that should be given to agency decisions.

by an attorney during the hearings; (2) that the altercation between Romero and Petrochoko arose out of a union matter which, under the rule of *Old Dominion Branch No. 496, National Association of Letter Carriers v. Austin,* 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745, permitted the use of the alleged profanity. These contentions are without merit. During the proceedings before the Board, Romero was free to select an attorney to represent him or to rely on other representation. The record does not indicate that Romero was in any way prejudiced by being represented by a national union official who appeared to be well versed in such proceedings.

The *Old Dominion* case has no application. The issue in that case was to what extent state libel laws could be used to collect damages for intemperate statements made by participants in a continuing labor dispute. The court held that the National Labor Relations Act controlled the liability and that the state laws were not applicable. In the course of its discussion, the court observed that in such labor disputes, the federal policy favored uninhibited, robust and wide-open debate. Romero's attack upon his superior officer did not arise out of a labor dispute but apparently was a personal matter. We find no prejudicial error in the proceedings before the MSPB or in the exercise of discretion by the Army in terminating the employment of Romero. *Adkins v. Hampton,* 586 F.2d 1070 (5th Cir. 1978); *Young v. Hampton,* 568 F.2d 1253 (7th Cir.1977).

AFFIRMED.