Robert N. COHEN, Plaintiff,

v.

Richard G. AUSTIN, administrator, General Services Administration, Defendant.

Civ. A. No. 92–CV–5623.

United States District Court, E.D. Pennsylvania.

Aug. 25, 1994.

Dennis L. Friedman, Philadelphia, PA, for plaintiff.

David R. Hoffman, James G. Sheehan, Lois W. Davis, U.S. Attys. Office, Philadelphia, PA, for defendant.

### *MEMORANDUM AND ORDER*

JOYNER, District Judge.

Before the Court are the cross-motions for summary judgment of the parties pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. This case involves an action filed by plaintiff, Robert N. Cohen, who was removed from his position as a GS–12 contract specialist with defendant, General Services Administration. The case has a lengthy procedural history, which we have already fully discussed in a previous opinion. *See Cohen v. Austin,* 833 F.Supp. 512 (E.D.Pa.1993) (de-

nying an earlier motion for summary judgment filed by defendant). Suffice it to say that plaintiff has filed suit in this Court alleging violations of Title VII, 42 U.S.C. § 2000e–16(c), in that his removal and denial of his within-grade increase were prompted by religious discrimination, and that his removal was based on reprisal for engaging in prior protected activities. Pursuant to the Civil Service Reform Act, 5 U.S.C. § 7701 et seq., plaintiff also seeks review of the decision of the Merit Systems Protection Board ("MSPB"), which affirmed defendant's actions of removing him and denying his within-grade increase. Finally, plaintiff seeks review of the decision of the Equal Employment Opportunity Commission ("E.E.O.C."), which affirmed the MSPB's findings of no discrimination and reprisal.

### Standards

#### A. Standard for a motion for summary judgment

In considering a motion for summary judgment, the court must consider whether the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show there is no genuine issue as to any material fact, and whether the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). The court is required to determine whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In making this determination, all reasonable inferences must be drawn in favor of the nonmoving party. *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2512. While the movant bears the initial burden of demonstrating an absence of genuine issues of material fact, the nonmovant must then establish the existence of each element of its case. *J.F. Feeser, Inc. v. Serv–A–Portion, Inc.,* 909 F.2d 1524, 1531 (3rd Cir.1990), *cert. denied,* 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)).

In cases where the parties have filed cross-motions for summary judgment, each side essentially contends that no issue of material fact exists from its perspective. *United States v. Hall,* 730 F.Supp. 646, 648 (M.D.Pa. 1990). The court must, therefore, consider each motion for summary judgment separately. *Id.* Nor do the standards under which the court grants or denies summary judgment change because cross-motions are filed. *Id.* Each party still bears the initial burden of establishing a lack of genuine issues of material fact. *Id.* Such contradictory claims do not necessarily guarantee that if one party's motion is rejected, the other party's motion must be granted. *See id.* (quoting *Rains v. Cascade Indus., Inc.,* 402 F.2d 241, 245 (3d Cir.1968)).

#### B. Standards under the Civil Service Reform Act

■ This Court has jurisdiction to hear plaintiff's claims because it is a "mixed case" of both discrimination and non-discrimination claims. *Kean v. Stone,* 926 F.2d 276 (3rd Cir.1991); *Gollis v. Garrett,* 819 F.Supp. 446, 449 (E.D.Pa.1993); *Mayo v. Edwards,* 562 F.Supp. 907, 908 (D.D.C.1983), *aff'd,* 741 F.2d 441 (D.C.Cir.1984). However, there are different standards of review with regard to mixed cases. For the non-discrimination claims (the denial of the within-grade increase and plaintiff's removal), the decision of the MSPB will be set aside if it is found to be: "1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; 2) obtained without procedures required by law, rule, or regulation having been followed; or 3) unsupported by substantial evidence." 5 U.S.C. § 7703(c) (1980); *Murray v. United States Dept. of Justice,* 821 F.Supp. 94, 108 (E.D.N.Y.1993), *aff'd,* 14 F.3d 591 (2nd Cir.1993). Review of the MSPB decision is limited solely to the administrative record.[1] *Murray,* 821 F.Supp. at 108; *Diaz v. United States Postal Serv.,* 668 F.Supp. 88, 91 (D.P.R.1987), *aff'd,* 853 F.2d 5 (1st Cir.1988). Further, judicial review of the MSPB's decision is very narrow. *Romero v. Department of the Army,* 708 F.2d 1561, 1563 (10th Cir.1983). To determine if

---

1. It should be noted that in this case, the administrative record consists of over 9,300 pages.

the decision is supported by substantial evidence, courts inquire whether the decision is supported " 'by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Tilley v. Frank,* 728 F.Supp. 1293, 1296 (E.D.La.1990); *Murray,* 821 F.Supp. at 108. While the evidence need not be unequivocal, there must be more than a mere scintilla of evidence which must reasonably support the MSPB's findings. *Henley v. United States,* 379 F.Supp. 1044, 1049 (E.D.Pa.1974). Under the arbitrary and capricious standard, courts will defer to the MSPB decision "unless the penalty is so harsh or disproportionate to the offense as to be an abuse of discretion." *Tilley,* 728 F.Supp. at 1297. Reviewing courts should not generally inquire into the wisdom of the agency's personnel decisions or substitute its own judgment for that of the agency when considering personnel decisions because such decisions are usually within the competence and discretion of the executive officials. *Diaz,* 668 F.Supp. at 91 (citations omitted).

With regard to the discrimination claims, however, plaintiff is entitled to *de novo* review. 5 U.S.C. § 7703(c)(3) (1980); *Rana v. United States,* 812 F.2d 887, 890 (4th Cir. 1987). Thus, plaintiff is entitled to a review of the formal record as well as any new evidence that is presented to this Court. *Rana,* 812 F.2d at 890; *Hodgson v. Department of the Air Force,* 750 F.Supp. 1037, 1040 (D.Colo.1990), *aff'd,* 999 F.2d 547 (10th Cir.1993).

### Discussion

### I. Review of the MSPB decision

Before addressing plaintiff's arguments, a brief discussion about performance standards is warranted. As a GS–12 contract specialist working for a governmental agency, plaintiff was bound by a set of performance standards which the agency used in evaluating his performance. *See Wilson v. Department of Health and Human Serv.,* 770 F.2d 1048, 1050–1053 (Fed.Cir.1985) (discussing performance appraisal system for federal employees). Plaintiff's performance standards were divided into five critical elements, each of which represented different tasks to be performed by plaintiff. For instance, critical element number one states "Analyzes requirements and plans procurements. Includes the following tasks: Reviews procurement requests ... Identifies and resolves deficiencies in scope of work and specifications. Performs industry analysis. Develops the procurement plan." For each critical element, there are standards "which set forth the degree of proficiency necessary to achieve a given rating (e.g., minimally satisfactory, satisfactory, or outstanding)." *Wilson,* 770 F.2d at 1050. The purpose of these standards is "to the maximum extent feasible, permit the accurate evaluation of job performance on the basis of objective criteria ... related to the job in question for each employee or position under the system." 5 U.S.C. § 4302(b)(1) (1977 & Supp.1994).

### A. Different performance standards

■ Plaintiff first argues that he is entitled to summary judgment because different performance standards were imposed on him than were imposed on other GS–12 contract specialists. Essentially, plaintiff argues that the agency action in providing him with different standards is arbitrary and capricious, that the MSPB erred by not considering this argument, and as such, the decision below is not supported by substantial evidence. However, plaintiff's first argument is without merit.

In analyzing this issue, we will only consider plaintiff's argument with regard to critical element number two of his performance standards. In so doing, we note that to sustain defendant's action, it only needs to be shown that plaintiff's performance was unacceptable with regard to one critical element. *Robinson v. Department of Army,* 50 M.S.P.R. 412, 421 (1991) (citing *Wilson v. Department of the Navy,* 29 M.S.P.R. 6, 8 (1985)). Since Administrative Judge Squire and the MSPB ultimately affirmed defendant's actions by concluding that plaintiff had failed in his performance only with regard to critical element number two, we only need to consider that critical element.

It is clear from the record that plaintiff received his initial set of performance standards on September 22, 1988. These standards set out the expected performance for

all GS–12 contract specialists within the branch. Critical element two states as follows: "Develops and issues solicitations. Includes the following tasks: Assembles and issues solicitation packages. Identifies exceptions or changes needed in standard contract provisions. Selects appropriate contract type. Coordinates socioeconomic factors with appropriate activities." Under the standards of expected performance for critical element number two, the following is stated:

—Solicitations are complete and conform to requirements of the FAR [Federal Acquisition Regulations] and GSAR [General Services Acquisition Regulations]. Protests or audits do not later reveal defects in the solicitation package such that the package would not have been acceptable if the defects had been identified earlier.— Solicitations are distributed to a sufficient number of prospective bidders to ensure competition. When possible, solicitations are left open longer than the 30–day minimum in order to increase competition. Procurements do not have to be re-solicited due to insufficient competition.—Supports socioeconomic programs by using 8A contracts when practical.—Procurements not set aside for small business are adequately justified when under management or third party review.—Solicitations are completed within established time frames.

Apparently, when plaintiff received his "warning regarding unacceptable performance" letter on October 21, 1988, it included a set of revised performance standards to which plaintiff was held during his ninety day probationary performance improvement period. With regard to the second critical element, the following was included:

*Expected performance:* Solicitations are to be complete and in conformance with the FAR and GSAR. They are to be distributed to a sufficient number of prospective bidders so that they do not have to be re-solicited. Protests or administrative audits should not reveal any major solicitation defects, which would render the solici-

tation package unacceptable. Solicitations are to be completed within established time frames allowing for award within an acceptable variance to the anticipated award date provided by the funding office. You are also expected to use 8(a) contracts when practical. Contracts not set aside for small business must be properly justified for the management. All documentation must be self supporting and understandable to third party review. Technical errors discovered in the solicitation should be resolved in one or two days (unless excusably delayed by parties outside of this office).

*Marginally acceptable performance:* Minimally acceptable performance would be having the solicitation in for review (approximately) 105 days before award, in order to guarantee award on the anticipated target award date. There would be no mistakes that could result in a solicitation/award being nullified upon protest. The solicitation must be open at least 30 days. Technical errors should be resolved within five days. At the minimum, you should notify the cognzant [sic] engineer of any technical problems immediately and resolve the problem later.

Plaintiff bases much of his argument on the fact that defendant did not provide any documentary evidence regarding the performance standards of other GS–12 contract specialists within the branch in answer to his interrogatories. In the proceedings below, Administrative Judge Squire granted plaintiff's motion for sanctions for defendant's refusal to comply with the discovery requests, and as such, allowed plaintiff to take a negative inference from defendant's actions. Plaintiff now argues that if the performance standards of other GS–12's had been provided, they would have been different than the performance standards actually imposed on plaintiff. However, the evidence in the record does not support this conclusion, despite the negative inference.[2]

---

**2.** Although Judge Squire granted plaintiff's motion for sanctions, it is important to note that she did not mention the negative inference in determining that the performance standards were not different. Further, the MSPB did not address this issue at all when reviewing Judge Squire's decision.

Michael Grieco, one of plaintiff's supervisors, testified that when he gave plaintiff the October 21st warning letter, it included a performance improvement plan in it, which, included, among other things, the standards set out for marginally acceptable performance. Prior to that, the performance standards had only set out the standards for expected performance, which plaintiff was required to meet for satisfactory performance. R. 1712–13, 1736. In addition, the performance standards and critical elements that plaintiff received in October 1988 were identical to those of all other GS–12's in the branch, and all GS–12's received the revised performance standards within that same time frame. R. 196–97. He further testified that plaintiff's original performance standards were identical for all GS–12's, and that they were rewritten for all GS–12's sometime in the summer of 1988. R. 123, 1633–35. Bruce Zalut, another one of plaintiff's supervisors, also testified that the performance standards issued in September 1988 were identical for all of the GS–12's in the branch, and were rewritten because the Employee Relations Branch required them to be standardized. R. 2167–68. Finally, Louis Amorosi, another GS–12 employed by defendant, testified that his performance standards appeared to be the same as those received by plaintiff in September 1988. R. 995–97.

While the MSPB did not consider whether plaintiff's performance standards were different, and Judge Squire did not consider the negative inferences, we find there has been no prejudice to plaintiff because the above evidence shows that plaintiff's performance standards were identical to those of all other GS–12's. Aside from the negative inference, plaintiff has failed to produce any evidence that his performance standards were different from those of other GS–12's. Although we acknowledge that plaintiff could not produce any documentary evidence of this, he still could have produced some testimony by witnesses to rebut defendant's evidence. As stated by the Third Circuit, when drawing a negative inference, consideration of all evidence to the contrary must be made. *Kline v. Director, Office of Workers' Compensation Programs, U.S. Dept. of Labor*, 877 F.2d 1175, 1180 (3rd Cir.1989). Thus, even if

Judge Squire had considered the negative inference, she would have had to weigh it against the above evidence. Given that defendant has presented evidence on this issue, and plaintiff has not produced any evidence, we cannot say Judge Squire's determination that the standards were the same is not supported by substantial evidence. As such, plaintiff's first argument fails. *See e.g. Luscri v. Department of the Army*, 39 M.S.P.R. 482, 492 (1989) (appellant's mere assertion that his performance was not acceptable was insufficient to rebut substantial evidence presented by agency through testimony even though agency presented no documentary evidence of such performance).

## B. Performance standards are unreasonable

Plaintiff next argues that the performance standards to which he was held are inherently unreasonable because the standards for marginally acceptable performance are more difficult to attain than those for expected performance. For the following reasons, we agree with plaintiff.

■ As stated previously, agencies are required to establish performance appraisal systems that allow an accurate evaluation of one's job performance based on objective criteria to the maximum extent feasible. *Rogers v. Department of Defense Dependents Sch.*, 814 F.2d 1549, 1553 (Fed.Cir.1987) (citing 5 U.S.C. § 4302(b)(1) (1982)). When an employee challenges the reasonableness of the performance standards, we are entitled to make an independent determination of whether the standards comply with the above statute. *Id.* In order to be valid under the statute, the standards should be " 'sufficiently objective and precise in the sense that most people understand what they mean and what they require ...' " *Id.* (citations omitted).

In *Williams v. Department of Health and Human Serv.*, 30 M.S.P.R. 217 (1986), the court rejected the performance standards imposed on plaintiff, a secretary for the Food and Drug Administration, on the basis that the performance standards as written were unclear, and because the performance stan-

dard for minimally satisfactory performance appeared to require a higher level of performance than the standard for fully satisfactory performance. Finding that such standards were not reasonable, the court stated that "performance standards must be specific enough to provide a firm benchmark toward which the employee must aim his performance—not an elusive goal which the agency at its pleasure may find the employee met or failed to meet." *Id.* at 219–20.

■ Likewise, in this case; plaintiff's performance standard for marginally acceptable performance appears to be more difficult to achieve than the standard for expected performance. First, although the standard for expected performance requires solicitations to be completed within established time frames so that they are awarded "within an acceptable variance to the anticipated award date," such is not the case under the standard for marginally acceptable performance. Rather, under this standard, plaintiff must turn in the solicitation for review within 105 days before award, *"in order to guarantee award* on the anticipated target award date." (emphasis added) Thus, under the marginally acceptable standard, plaintiff is held to a higher standard because the solicitation must be awarded on the target date whereas the expected performance standard allows for a variance from the anticipated date.

Second, under the expected performance standard, "protests or administrative audits should not reveal any major solicitation defects, which would render the solicitation package unacceptable." However, under the marginally acceptable standard, "there would be no mistakes that could result in a solicitation/award being nullified upon protest." Arguably, the latter is also more difficult to achieve than the former because the latter allows for no mistakes, whereas the standard for expected performance simply requires there to be no *major mistakes* or defects, thus apparently allowing for minor defects in the solicitation.

While the MSPB rejected this argument by plaintiff, we find its reasoning to be unsound. The MSPB stated:

although the "marginally acceptable" standard references performance that would "guarantee" an award on the anticipated target date, while the "expected performance" standard references performance that allows for an award "within an acceptable variance to the anticipated award date," the former standard pertains to submitting a solicitation for review, while the latter standard pertains to completed solicitations. Although the "marginally acceptable" standard's time frames are more specific, the additional specificity does not establish that it is harder to achieve than the less specific "expected performance" standard. For these reasons, we find that the "expected performance" standard is harder to achieve than the "marginally acceptable performance" standard, and the appellant's argument to the contrary is without merit.

*Cohen v. General Serv. Admin.,* 53 M.S.P.R. 492, 500 (1992).

Given that the purpose of the marginally acceptable standard is to inform plaintiff about the minimum requirements of satisfactory work, *see* performance standards *supra* page 344, it defies logic that the standard would discuss what is acceptable for a solicitation submitted for review, but not explain what is minimally acceptable for a completed solicitation. Obviously, a solicitation for review is just a draft, whereas the completed solicitation is the final work product, and ultimately the work upon which plaintiff is judged. Thus, it is doubtful that the two standards refer to two different types of solicitations.

Even if the marginally acceptable performance standard refers to a solicitation for review as opposed to the final work product, the marginally acceptable standard is still harder to achieve. The language of the standard requires the solicitation to be submitted within the time frame in order to guarantee award on the anticipated target award date. Thus, whether the standard refers to a solicitation for review is not the issue because either way, the end result is that the solicitation submitted must be guaranteed to be awarded on the target date, whereas completed awards need only meet an acceptable variance of the target date. Thus, MSPB's conclusion that the marginally acceptable standard is not harder to meet is erroneous.

As such, because the standards are not clearly written and they appear to be more difficult to achieve at the marginally acceptable level, the performance standards as written are unreasonable.

### C. Performance standards are absolute

█ Plaintiff also argues that the performance standards are invalid because they are impermissibly absolute. An absolute performance standard is one that allows for a rating of unsatisfactory performance based on a single incident of poor performance. *Smith v. Department of Veteran Affairs*, 59 M.S.P.R. 340, 348 (1993). While absolute performance standards are allowed in cases where a single failure to meet the standard could result in breach of security, injury, death or great monetary loss, absent such circumstances, an absolute performance standard is invalid, and the establishment of such a standard constitutes an abuse of discretion. *Id.; Callaway v. Department of the Army*, 23 M.S.P.R. 592, 598 (1984).

█ In *Smith*, the court held that the performance standards imposed on a pharmacist were impermissibly absolute. The standards stated that a pharmacist: "Upon receipt of a medication order ... or prescription ..., always reviews and interprets physicians [sic] order to ensure the appropriate dosage and directions ... Always contacts physician when there is an incompatibility or improper dose ... Shows no hesitancy in contacting physicians." *Id.* at 348. The court reasoned that the standards were absolute because a failure to review and interpret a physician's order as provided, or to contact a physician for clarification on a single incident would result in an unsatisfactory rating under the performance standards. *Id.*

Similarly, in *Sullivan v. Department of the Navy*, 44 M.S.P.R. 646, 651–52 (1990), *aff'd*, 949 F.2d 403 (Fed.Cir.1991), the court found the standard that "all recurring reports are [to be] accurately prepared and submitted/received by the required dates" to be absolute. The court noted that there was no evidence that failure to meet the standard would cause death, injury, breach of security or great monetary loss to justify an absolute standard. While the court also acknowledged that an absolute standard is not fatally invalid if the position description, written instructions and agency clarify the standard so that the employee knows the standard is not applied in an absolute manner, the court held there was no evidence that the employee was aware of this in *Sullivan*.

In the present case, the performance standards imposed on plaintiff are absolute. First, the marginally acceptable performance standard, as stated above, requires plaintiff to guarantee award of the solicitation on the target date. Second, the marginally acceptable standard allows for "no mistakes that could result in a solicitation/award being nullified upon protest." Thus, under the marginally acceptable standard, if plaintiff failed to award the solicitation by the targeted award date, or if the solicitation contained errors, plaintiff's performance would be rated as unacceptable. Even under the standards for expected performance, there could not be any major solicitation defects which would render the solicitation package unacceptable. Given that a failure to meet these standards would result in a rating of unacceptable performance similar to the standards in *Sullivan*, the standards are absolute.

While the MSPB rejected plaintiff's argument that the standards were absolute, the MSPB made this determination by reasoning that plaintiff was fired for committing more than just one error. In so doing, the MSPB considered plaintiff's performance under the standards. Rather than looking at the standards in the abstract, the MSPB reasoned that when plaintiff failed to work on a certain solicitation package assigned by defendant, plaintiff committed several errors under the marginally acceptable performance standards, such as failing to have the solicitation in for review before 105 days, failing to guarantee award on the target date, failing to keep the solicitation open at least 30 days and failing to prevent mistakes that could have resulted in the award being nullified upon protest. *Cohen v. General Serv. Admin.*, 53 M.S.P.R. 492, 501 (1992).

However, the MSPB's analysis is faulty because it does not address whether the standards are absolute. Determining wheth-

er a standard is absolute and invalid is separate from determining whether plaintiff's conduct as measured by the performance standard is unacceptable. *Callaway,* 23 M.S.P.R. at 600. While plaintiff may have committed several errors under the standards, the number of errors cited by defendants is irrelevant to the question of whether the standards are absolute. If the standards were not absolute, they would have provided some guidelines to plaintiff as to how many mistakes could be made before his performance was unacceptable, such as stating how many solicitations could be submitted late. Rather, under the standards imposed, plaintiff's one failure in any of the tasks resulted in unacceptable performance.

From the record, we also find no evidence justifying the absolute standard or that plaintiff knew the standards were not imposed in an absolute manner. Indeed, Michael Grieco even testified that prior to giving plaintiff the October 1988 warning letter of unacceptable performance, which contained the standards imposed on plaintiff, plaintiff did not even know what marginally acceptable performance was supposed to be. R. 1713. As such, defendant abused its discretion in implementing the above performance standards. This, coupled with the fact that the standards are also unreasonable, requires us to reverse the MSPB's decision sustaining plaintiff's removal from his employment and denying his within-grade increase. *See e.g. Eibel v. Department of the Navy,* 857 F.2d 1439, 1444 (Fed.Cir.1988) (reversing MSPB's decision upholding appellant's removal based on invalid performance standards).

### D. Performance standards are not objective

■ Although there is sufficient evidence to reverse plaintiff's removal and denial of the within-grade increase based on the above reasons, we also agree with plaintiff's argument that the performance standards are not entirely objective. While a performance standard is not invalid if it allows for some subjectivity by the reviewing official, it should be sufficiently objective for the employee to know what is expected of him, and to "provide the employee with a firm benchmark toward which to aim his performance, and not an elusive goal which the agency may find the employee met or failed to meet at its pleasure." *O'Neal v. Department of the Army,* 47 M.S.P.R. 433, 441 (1991); *see also* 5 U.S.C. § 4302(b)(1).

■ In *O'Neal,* the court held that the performance standards were not sufficiently objective where appellant's supervisor could not adequately explain how she determined the difference between acceptable and unacceptable performance with regard to a certain critical element. She noted the work would be unacceptable if it constantly had to be rewritten and acceptable if rewriting occurred " 'once in a blue moon.' " *Id.* The court held the agency failed to present substantial evidence that it had apprised its employee of the standards against which she was measured in both practice and by its instructions.

In the present case, there seems to be some confusion over how plaintiff's supervisors arrived at performance ratings. Michael Grieco testified that with regard to the standards under which plaintiff was rated in September 1988, in order to receive a satisfactory rating, the employee would have to comply with the expected performance standard. R. 1673. To receive a two or a one rating (for marginally acceptable performance or unsatisfactory) would depend on how often the employee failed to meet the expected level of performance. Mr. Grieco estimated that if the employee failed to meet the standard seventy percent of the time, the employee would probably get a two or a one. R. 1674–75, 1677, 1686. However, Mr. Grieco admitted there were no written standards which established any level of performance other than expected performance. R. 1677. Further, he stated that with regard to critical element one, if the contract specialist "repeatedly" failed to meet the expected level of performance, he would get a two or a one, but he admitted there was no written standard indicating what "repeatedly" meant. R. 1677–78. Mr. Grieco also testified that the standards were revised so as to establish more precise standards in which to rate the employee, ie., such that the employee would be rated by the amount of times he met or

exceeded the expected level of performance. R. 124–25. Interestingly, he admitted that the performance standards to which plaintiff was held prior to September 1988 established criteria to receive a rating at the one, three and five levels, but the revised standards only established criteria to receive a performance rating of a three (satisfactory), R. 138, thus indicating the revised performance standards are actually less precise.

Mr. Newburg, another one of plaintiff's supervisors, testified that the new performance standards established in September 1988 were the performance standards under which plaintiff was evaluated up until the time of his removal. R. 837–8. When plaintiff was first given the new performance standards, Mr. Grieco was his immediate supervisor. R. 888. Although Mr. Newberg did not testify as to how he arrived at the performance ratings for critical element number two, his testimony indicates that he evaluated plaintiff subjectively with regard to other critical elements. For instance, when asked about his criticisms of plaintiff under critical element number one, Mr. Newburg was unable to specify any time frames set forth in that critical element for conducting negotiations, although he cited plaintiff for deficiencies in that area. *See* R. 873–79. However, he indicated the critical element "indirectly" set forth a time frame if one referred to FAR (Federal Acquisition Regulations) or GSAR (General Services Acquisition Regulations). *Id.* at 873–75. Upon further questioning, he indicated that those regulations only set forth "a reasonable time" to begin negotiations. *Id.* at 875. When questioned about other aspects of critical element one, Mr. Newburg was similarly evasive. *Id.* at 876.

Not only does it appear the standards were not applied objectively, but the standards themselves are not written in an objective manner. As plaintiff argues, there is nothing in the standards indicating to plaintiff when unacceptable performance occurs with regard to any errors made. For instance, although the standards state technical errors must be resolved within a certain number of days, does that mean a failure to

resolve technical errors results in failure of the critical element? Likewise, the fact that it is difficult to discern exactly what is required of plaintiff shows the standards are not objective. "Under Chapter 43, employees will be protected from arbitrary treatment only if agencies establish objective performance standards that are 'reasonable, sufficient in the circumstances· to permit accurate measurements of the employee's performance, and adequate to inform the employees of what is necessary to achieve a satisfactory or acceptable rating.'" *Eibel v. Department of the Navy*, 857 F.2d 1439, 1444 (Fed. Cir.1988).

Based upon a review of the performance standards under critical element number two, and the above testimony, we find the standards are not sufficiently objective so as to provide plaintiff with a firm benchmark as to the difference between acceptable and unacceptable performance. It appears that Mr. Grieco evaluated plaintiff based on subjective criteria, i.e., whether the expected standard had been met based on some undefined amount of times. Further, the standards themselves do not adequately delineate the difference between acceptable and unacceptable performance or even marginal performance. As such, plaintiff's performance cannot be evaluated under these invalid standards, *see O'Neal*, 47 M.S.P.R. at 441, and the decision below must be reversed.

## II.   *Title VII claims*

■   Plaintiff alleges that defendant has violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., in that defendant discriminated against him because of his religion (Jewish) and retaliated against him by firing him when he asserted a claim of religious discrimination during the administrative proceeding. Plaintiff argues that the decisions of the MSPB and the Equal Employment Opportunity Commission (EEOC), which both held that plaintiff had not proved his claims of discrimination and reprisal, are not supported by substantial evidence and therefore asks this Court to

grant summary judgment in his favor on both of these claims.[3]

As a preliminary matter, we note that plaintiff's characterization of this Court's function is not altogether correct. Plaintiff acknowledges that this Court has *de novo* review of his Title VII claims. *See Chandler v. Roudebush*, 425 U.S. 840, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976). Despite this acknowledgement, plaintiff asks us to reverse the above decisions because they are not supported by substantial evidence, something we are clearly not entitled to do.

Our function in deciding the motion for summary judgment is to determine whether any issues of fact exist. While we are entitled to review the administrative record, we are also entitled to consider new evidence presented by the parties, and are not bound in any way by the determinations made by the MSPB and the EEOC below. *Prince v. Commissioner, United States Immigration and Naturalization Serv.*, 713 F.Supp. 984, 990–91 n. 10 (E.D.Mich.1989) (*de novo* review entitles party to an independent assessment of the record without being limited to a review of the EEOC decision). Logically, we must look at all the evidence in a fresh light, and make our own determination of whether or not there is evidence of discrimination and reprisal. *See Sperling v. United States*, 515 F.2d 465, 484 (3rd Cir.1975), *cert. denied*, 426 U.S. 919, 96 S.Ct. 2623, 49 L.Ed.2d 372 (1976) (agency record can be reviewed *de novo* on a motion for summary judgment to determine whether any genuine issue of fact exists as to discrimination). While the ultimate outcome may be that we will reverse the EEOC and MSPB because we determine that evidence of discrimination and reprisal exist and plaintiff has proven his case (assuming for argument sake that is actually true), it will not be because we find the decisions to be unsupported in the administrative record by substantial evidence. That simply is not a determination that we are here to make. *See e.g. Allen v. United States*, 542 F.2d 176 (3rd Cir.1976) (district court erred in granting defendant's motion for summary judgment in employment dis-

crimination case by concluding the administrative determination was neither arbitrary nor capricious, and was supported by substantial evidence); *Leach v. Department of the Treasury*, Civ.A. No. 86–1942, 1987 W.L. 7198, at 1 (E.D.Pa. Feb. 25, 1987) (court rejected defendant's argument that it was entitled to summary judgment on discrimination claims because MSPB's decision was not arbitrary and capricious since review of claims was *de novo* ).

## A. *Religious discrimination*

Plaintiff first argues that he is entitled to summary judgment because the overwhelming weight of the evidence shows that defendant discriminated against him on the basis of his religion, and therefore that it violated Title VII. There are two ways in which a Title VII claim can be proven. *Equal Employment Opportunity Comm. v. Metal Serv. Co.*, 892 F.2d 341, 346 (3rd Cir.1990); *Butler v. Elwyn Inst.*, 765 F.Supp. 243, 246 (E.D.Pa. 1991). First, a plaintiff may utilize the disparate impact theory. Under this theory, an employer applies a specific employment practice which appears neutral on its face, but causes a substantial adverse impact on a protected group. *Metal Service*, 892 F.2d at 346 (citing *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 646, 109 S.Ct. 2115, 2119, 104 L.Ed.2d 733 (1989)). Once the plaintiff shows there is a disparate impact, the employer must justify the employment practice as serving a legitimate business goal. *Id.* If the goal is found not to be legitimate, then there is a violation of Title VII. However, proof of intentional discrimination by the employer is not required under this theory. *Id.* at 346–47.

The other way in which discrimination can be established is by the disparate treatment theory. Under this theory, a violation occurs when there is evidence that an individual in a protected group has been singled out by the employer and treated less favorably than other similarly situated employees who are not in a protected group, on the basis of an impermissible criterion under Title VII. *Id.*

---

**3.** Defendant does not seek summary judgment on the Title VII claims but rather concedes there are "genuine issues of fact in dispute in this matter."

Defendant's response to plaintiff's motion for summary judgment, p. 8.

at 347 (citing *International Bd. of Teamsters v. United States*, 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 1854–55 n. 15, 52 L.Ed.2d 396 (1977)). Proof of the employer's discriminatory motive is vital under this theory. *Id.* Such intent can be proven by either direct or circumstantial evidence. *Id.* (citations omitted). Absent direct evidence of discrimination, plaintiffs can establish intent by meeting the following test as set out by the U.S. Supreme Court and adopted by this circuit. *Weldon v. Kraft, Inc.*, 896 F.2d 793, 796–97 (3rd Cir.1990). The plaintiff must first show a *prima facie*[4] case of discrimination. *Id.* at 797; *Lewis v. University of Pittsburgh*, 725 F.2d 910, 914 (3rd Cir.1983), *cert. denied*, 469 U.S. ·892, 105 S.Ct. 266, 83 L.Ed.2d 202 (1984) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). Once this has been established, the burden then shifts to the employer to establish a legitimate reason for taking the alleged discriminatory action. *Weldon*, 896 F.2d at 797; *Lewis*, 725 F.2d at 914. Thereafter, the plaintiff must establish that the employer's nondiscriminatory reason was merely pretextual. *Weldon*, 896 F.2d at 797; *Lewis*, 725 F.2d at 914. To demonstrate pretext, plaintiff must show that the nondiscriminatory reason was merely a coverup for a discriminatory decision by "either directly ... persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered reason is unworthy of credence." *Ezold v. Wolf, Block, Schorr and Solis–Cohen*, 983 F.2d 509, 523 (3rd Cir. 1992), *cert. denied*, — U.S. ——, 114 S.Ct. 88, 126 L.Ed.2d 56 (1993) (citations omitted).

Normally, to sustain a motion for summary judgment, the plaintiff need not meet this burden; rather, she must show that there is a genuine issue of material fact as to whether the employer intentionally discriminated against her. *Weldon*, 896 F.2d at 797. Likewise, in order for the defendant to prevail in a summary judgment motion, it must demon-

strate that plaintiff is unable to show an intent to discriminate either directly or indirectly because the business reason given by the employer is subject to factual dispute. *Hankins v. Temple Univ.*, 829 F.2d 437, 440–41 (3rd Cir.1987). A plaintiff who has made a *prima facie* showing of discrimination will prevail on a summary judgment motion if she can demonstrate that the employer's proffered explanation is not credible. *Weldon*, 896 F.2d at 797. However, we must also consider these rules in light of the fact that plaintiff has brought the motion for summary judgment in this case.

Reviewing the vast record, the evidence regarding religious discrimination is as follows. There is evidence of disparaging statements allegedly made by employees about plaintiff. For instance, one employee, Dyann Jacobs, testified that Rich Newburg stated that plaintiff was the "dumbest Jew he ever saw." R. 2248. She also testified that Rich Newburg referred to plaintiff's yarmulke as a "beanie." *Id.* On another occasion, employee Lydia Domeneche overheard Mr. Newburg state that plaintiff would be in "heaven" had he been present at an employee gathering where bagels and cream cheese were served. R. 1026. This statement was confirmed by another employee, Ana Garcia. R. 983–84. Finally, while not pertaining to anything plaintiff did while he was employed by defendant, there is evidence that Mr. Newburg made remarks about the "Jew judge" and plaintiff's lawyer during the prior administrative trials. R. 1039, 2187.

Although plaintiff testified that he was the only Jewish person in the Branch, Bruce Zalut, the supervisor who actually approved plaintiff's removal, is also Jewish. R. 406. Further, Rich Newburg testified that his grandfather was Jewish, and he is one-quarter Jewish. R. 952. He agreed, however, that there were no other Jewish people in the Branch. *Id.* Mr. Newburg denied making

---

**4.** The elements of a *prima facie* case of discrimination are as follows: 1) the plaintiff is a member of a protected class; 2) she was qualified for the position; 3) despite her qualifications, the employer terminated her; 4) and after the termination, the employer sought a replacement. *Doe v. Kohn, Nast & Graf*, 862 F.Supp. 1310, 1318 at

n. 5 (E.D.Pa.1994) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 n. 13, 93 S.Ct. 1817, 1824 n. 13, 36 L.Ed.2d 668 (1973)). However, as noted in *Doe*, in a discriminatory firing case, the fourth element of the *McDonnell* test is not required. *Id.*

any comments about plaintiff being a "dumb Jew" and wearing a "beanie," and attributed those comments to other employees in the Branch. R. 2092, 2098, 2119. Although he admitted making the comment about the cream cheese and bagels, he stated that he was simply referring to plaintiff's penchant for snacking. R. 2097. Finally, while he denied the specific comments about the administrative law judge and plaintiff's attorney, he felt there was some sort of "natural bias" because the administrative proceedings had a Jewish judge, and because plaintiff's attorney, Dennis Friedman, was acting overly comfortable during the proceeding. R. 2100, 2101–2114.

While this evidence alone hardly establishes a case for religious discrimination, plaintiff relies on the disparate treatment theory to show he was treated less favorably than other GS–12's in the branch. Indeed, plaintiff has presented evidence contained in hundreds of pages of transcript and exhibits which indicate that other employees in the branch, including Rich Newburg, made contracting errors similar or more substantial to the errors for which plaintiff was denied his within-grade increase and ultimately removed from his job. For instance, one project (apparently worked on by Mike Grieco) that plaintiff reviewed was delayed for one and a half years from the time the procurement request came in. R. 950–51. Plaintiff testified there was no documentation to explain the delay, yet he was required to explain in writing any delays over 30 days. R. 951. He found delays in many of the other contract specialists' files that he reviewed, yet there were no memos in any of the folders explaining the delays. With regard to Mike Grieco's project, plaintiff noted the advance procurement plan had only one signature on it which was a violation of FAR. R. 955–56. In the past, defendant had cited plaintiff for violating FAR, yet Mike Grieco did not get reprimanded nor did other employees in the Branch get reprimanded for various other errors.

Plaintiff also testified that many of the files that he was initially given to work on consisted of "stale" files, i.e., files that had been in the branch for several years that were only partially worked on by other GS–12 contract specialists. R. 2322–24. While plaintiff was expected to award at least one contract a month, many of the files he received had missing documents. R. 849, 776. Assuming this to be true, it would be quite difficult for plaintiff to meet his deadlines as he was required. Moreover, Roshan Bogga, a supervisor in another Branch, wrote a letter expressing appreciation for the work plaintiff did on a particular job with him. R. 685–88. Mr. Bogga apparently sent this letter to Bruce Zalut, and before a copy was distributed to plaintiff, Rich Newburg intercepted it and directed that all copies of the letter be destroyed. R. 687, 488–90. Mr. Newburg testified that he did this because he did not think it was appropriate to single out plaintiff since he had failed to handle the project within the required time frame and it would set a "bad precedent." R. 489. Mr. Grieco testified that he did not give plaintiff the letter because he felt that another employee, Libby Bowman, should have gotten the credit for working on the project and not plaintiff. R. 1559–61. Finally, several witnesses testified that Mr. Newburg berated plaintiff on numerous occasions by yelling and screaming at him in front of other employees. R. 2247, 2257, 2275, 980–82, 1015–17, 1040. Plaintiff went to Mike Grieco to complain about Mr. Newburg's treatment of him, however, despite this fact, Mr. Grieco later assigned Mr. Newburg as plaintiff's immediate supervisor. R. 1722, 82–84. Bruce Zalut was also aware of Mr. Newburg's alleged treatment of plaintiff. While he testified that he was not happy with Newburg's skills as a supervisor, he did not reassign plaintiff to another supervisor because Mr. Newburg needed to learn tact. R. 466, 475–76. While plaintiff's evidence of disparate treatment is too extensive to recite fully here, there is enough evidence from which a reasonable jury could infer that defendant had a discriminatory motive for firing plaintiff and denying him his within-grade increase. *See Equal Employment Opportunity Comm. v. Metal Serv. Co.*, 892 F.2d 341, 351–52 (3rd Cir.1990) (federal courts should not make the requirement for proving a prima facie case overly burdensome).

However, this does not end our inquiry, because there is evidence from which a reasonable jury could also conclude that defendant had legitimate reasons for denying plaintiff's within-grade increase and for firing plaintiff. Both Mr. Grieco and Mr. Newburg testified in detail about plaintiff's performance problems. Mr. Grieco first learned plaintiff was having problems with timeliness back in April 1988. R. 1484. He began to discuss plaintiff's work with him on a bi-weekly basis. R. 1553. Mr. Newburg testified that he began discussing plaintiff's work with him on a daily basis in order to help him prioritize his work and to see what was accomplished. R. 955–66. Despite putting plaintiff on a performance improvement plan in October 1988, the evidence suggests that plaintiff continued to exhibit the same deficiencies. Not only did Mr. Newburg and Mr. Grieco testify in detail about many mistakes made by plaintiff under each critical element, but the October 1988 warning letter, the letter denying the within-grade increase, the letter citing plaintiff's unacceptable performance for the period ending February 28, 1989 and the letter containing the advance notice of removal all contain numerous examples of errors committed by plaintiff on various projects under each critical element. As such, there is ample evidence from which a reasonable jury could conclude that defendant's actions were the result of legitimate non-discriminatory business reasons.

Plaintiff argues that the evidence clearly shows that defendant's actions were the result of religious discrimination. However, plaintiff has not established that defendant's explanation for its actions was merely pretextual. We note, however, that there is sufficient evidence to raise a genuine issue of material fact regarding pretext. For instance, on one project, plaintiff was supposed to have awarded a certain contract by March 1988. Despite Mr. Grieco's testimony that he had bi-weekly discussions with plaintiff regarding his work, he states he did not confront plaintiff about this project until they gave him the October 1988 warning letter. R. 1547. Plaintiff also testified that Mr. Grieco and Mr. Newburg often gave plaintiff conflicting directions. For instance, in one of the projects under critical element number two that resulted in plaintiff's removal, plaintiff testified that Mr. Grieco told him to prepare the solicitation as "full and open" competition. Mr. Newburg then told plaintiff to prepare the solicitation for small businesses and not for full and open competition. After plaintiff changed the solicitation, he was told by Mr. Grieco to change the solicitation back to full and open competition. R. 982. Arguably, this resulted in plaintiff not completing the solicitation within the deadline. R. 983. Plaintiff testified that several of the errors that he was cited for making were in fact made by other employees in the Branch. For instance, one of his projects was given to Dolores Burgess because plaintiff allegedly did not complete it in a timely manner. Yet this same project was one of the projects for which plaintiff was cited in the "warning of unacceptable performance" letter. R. 1306–09. Plaintiff also testified that another project for which he was faulted was actually a project completed by employee Monica Gormley. R. 1098–99. Plaintiff testified that many times he was reviewed for projects which he had not officially submitted for review, rather, that Mr. Newburg often secretly took the projects from his desk or his trash. R. 1148, 1260. For the projects that he did turn in, he was held to much stricter processing times than any other GS–12 contract specialists. R. 1141, 2489, 2479.

Plaintiff makes numerous other allegations in support of his claim of disparate treatment such as defendant falsified documents and backdated documents, kept secret notes on defendant and consistently awarded other contract specialists for their work while constantly berating plaintiff, although the other contract specialists committed as many if not greater errors than he did. However, we need not discuss all of these other allegations because it is clear that an issue of fact exists in this case. Plaintiff has presented sufficient evidence for a jury to find that he may have been treated differently than others by defendant. However, whether or not this treatment was because of his religion is really an issue of fact, which must be determined at some later point. Clearly, the evidence of the religious slurs and different treatment by his supervisors gives rise to an inference of

discrimination, but there is ample evidence presented by defendant by both testimony and documentary evidence (such as Mr. Newburg's notes) to show that plaintiff committed numerous and critical errors in his work product. Given that we are to view the evidence in a light most favorable to defendant, we are not inclined to say that the evidence shows "a discriminatory reason more likely motivated [defendant] or . . . that [defendant's] proffered reason is unworthy of credence." *Ezold v. Wolf, Block, Schorr and Solis–Cohen,* 983 F.2d 509, 523 (3rd Cir. 1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 88, 126 L.Ed.2d 56 (1993) (citations omitted); *Jalil v. Avdel Corp.,* 873 F.2d 701, 707 (3rd Cir.1989), *cert. denied,* 493 U.S. 1023, 110 S.Ct. 725, 107 L.Ed.2d 745 (1990) (summary judgment should not be granted if plaintiff raises a factual question regarding employer's real motivation for discharge because intent is a factual issue that needs to be " 'inferred from the facts and conduct of the parties.' "). As such, plaintiff's motion for summary judgment on the issue of religious discrimination is denied.

### B. Reprisal Claim

■ In order to prove a claim of reprisal (retaliation), plaintiff must show that he was engaged in protected activity under Title VII, he was subjected to an adverse employment decision by defendant and there was a causal link between defendant's actions and the protected activity. *See* 42 U.S.C. § 2000e–3(a) (1981)[5]; *Robinson v. Southeastern Pennsylvania Transp. Auth.,* 982 F.2d 892, 895 n. 1 (3rd Cir.1993); *Jalil v. Avdel Corp.,* 873 F.2d 701, 708 (3rd Cir.1989), *cert. denied,* 493 U.S. 1023, 110 S.Ct. 725, 107 L.Ed.2d 745 (1990); *Yartzoff v. Thomas,* 809 F.2d 1371, 1375 (9th Cir.1987), *cert. denied,* 498 U.S. 939, 111 S.Ct. 345, 112 L.Ed.2d 309 (1990). A prima facie case does not need to be proven at the summary judgment stage. *Yartzoff,* 809 F.2d at 1375. However, once a prima facie case has been established, defen-

dant then has the burden of establishing a legitimate, nonretaliatory explanation for its actions. *Id.* at 1376. The employer need not persuade the Court that its reasons were legitimate, rather, it is appropriate that defendant's evidence raises a genuine issue of material fact for the factfinder to conclude there was no retaliation. *Id.* The ultimate burden of proof still lies with plaintiff, however, and if a legitimate nonretaliatory reason is articulated, the plaintiff must prove that the explanation is pretextual and that he was the victim of retaliation. *Id.* at 1376–77. Summary judgment is generally unsuitable where plaintiff has proven a prima facie case because "of the 'elusive factual question' of intentional discrimination," although it is generally proper where a prima facie case has not been established. *Id.* at 1377 (citations omitted).

■ In *Yartzoff,* the Ninth Circuit held there was no error by the district court in concluding that a prima facie case could not be proven where EPA conducted a surprise quality assurance test at plaintiff's workplace. The court found there was no evidence that the test was given in retaliation of plaintiff's allegations that he had been discriminated against by his employer. Rather, the evidence showed that the test had been planned months before plaintiff even instituted his lawsuit. As such, plaintiff failed to establish the causal connection element necessary to prove a prima facie case.

However, with regard to plaintiff's other retaliation claims, the court erred in granting summary judgment for the employer because there was evidence of a prima facie case. Plaintiff established that shortly after he had filed his complaints of discrimination and had cooperated in investigations of his claims, his employer transferred various job duties away from him and he began to receive subaverage performance ratings. The court found that since the employer offered a legitimate rea-

---

**5.** Section 2000e–3(a) states "It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, . . . to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a) (1981).

son for its adverse employment decisions with regard to plaintiff, and there was enough evidence by plaintiff to raise a genuine issue of fact that the actions of the employer were pretextual, summary judgment in favor of defendant should not have been granted. *See also Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 732–33 (9th Cir. 1986), *cert. denied*, 494 U.S. 1056, 110 S.Ct. 1524, 108 L.Ed.2d 764 (1990).

In the present case, plaintiff alleges that he is entitled to summary judgment on the retaliation claim because he was forced to take annual leave to review agency documents in order to prepare for the administrative hearing on the denial of his within-grade increase, because defendant continued to apply the invalid performance standards against him, because defendant manufactured a case against him, in part, by using fraudulent documents in order to have him removed, and by failing to provide documents requested by plaintiff during discovery. He also contends that much of the conduct discussed above pertaining to the religious discrimination claim also proves his retaliation claim. For instance, plaintiff refers to his testimony that defendant frequently took documents off his desk that were not complete and used them to review his performance, that he was rated on one project actually performed by employee Dolores Burgess, and that defendant intentionally changed the priorities on plaintiff's assignments. Further, there is testimony by employee Dyann Jacobs who indicated that she heard plaintiff might be removed from his job months before he was actually removed. R. 702.

However, we need not review all of the evidence because it is clear that there are *genuine issues of material fact in this case.* First, issues exist as to whether plaintiff has proven a prima facie case of reprisal. There is certainly evidence that plaintiff engaged in protected activity—that of filing and litigating his religious discrimination claim—and that defendant acted adversely by firing him. However, it is not entirely clear that defendant fired plaintiff *because* of his claim for religious discrimination. While a reasonable jury could infer that plaintiff was fired in

retaliation for his religious discrimination claim because he was still involved in the administrative trial for the within-grade denial when the advance notice of removal letter was given to plaintiff, *see Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3rd Cir.1989), *cert. denied*, 493 U.S. 1023, 110 S.Ct. 725, 107 L.Ed.2d 745 (1990); *Nixon v. Runyon*, 856 F.Supp. 977, 988 (E.D.Pa.1994) ("Temporal proximity can give rise to an inference of causation."), we note there is no other evidence established by plaintiff showing the causal connection required for a prima facie case.

Even if the evidence suffices for a prima facie case, however, defendant has offered a legitimate reason for firing plaintiff. As such, there is sufficient evidence from which the factfinder could infer that defendant's reason was pretextual. For instance, the timing of the firing, the comment that plaintiff was going to be fired, and the alleged treatment of plaintiff in order to "build a case" for removal all support such an inference. It does not, as plaintiff asserts, conclusively establish that plaintiff is entitled to relief, especially since we are to view the evidence in a light most favorable to defendant. *See e.g. Jalil*, 873 F.2d at 709 ("factual issue regarding motivation … properly belongs to the factfinder."); *Miller*, 797 F.2d at 732–33 (issue of whether defendant's business reason was pretextual should not be resolved by motion for summary judgment). Thus, because genuine issues of fact remain, plaintiff's motion for summary judgment must be denied.

### Conclusion

Because plaintiff's performance standards are unreasonable, absolute and unobjective, defendant should not have evaluated plaintiff under them, and therefore we must reverse the decision of the MSPB affirming plaintiff's removal and denial of his within-grade increase. However, genuine issues of fact remain in plaintiff's claims of religious discrimination and reprisal. Therefore, plaintiff's motion for summary judgment on the Title VII claims is denied.